**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 10 CR 376** |
| | ) | |
| **THOMAS ZAJAC** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

In 2010, a grand jury indicted Thomas Zajac on charges arising from the

explosion of a device at the Hinsdale, Illinois Metra train station on September 1, 2006

and the sending of an allegedly related threatening letter to the Hinsdale Police

Department on or about October 12, 2006. Mr. Zajac was initially represented by a

series of appointed attorneys but began to proceed *pro se*, with standby counsel, as of

late March 2017.

The case was previously assigned to Judge Robert Dow and was reassigned to

the undersigned judge on October 11, 2022. At that point, Judge Dow had set the case

for trial in January 2023. After the reassignment, the Court reset the trial date by

approximately one week, to January 17, 2023.

The trial began on January 17 with jury selection and opening statements. There

were initially twelve jurors and three alternates. Two jurors were lost due to illness in

the early days of the trial, the second as a result of testing positive for COVID-19. That

fact was reported to the Court on the morning of the fourth day of trial, January 20.

Later that morning, the Court declared a mistrial due to the absence of sufficient jurors

to complete the trial.  This was the result of the two juror illnesses and the request of several other jurors to be excused due to the risk of infection.  Mr. Zajac did not object to excusing these jurors, and he did not object to the declaration of a mistrial, which in any event was essentially a formality once there were fewer than twelve jurors remaining.  The Court will return to the mistrial point later in this decision.

The jury trial was reset to late August 2023 and was held over a seventeen-day period ending on September 15, 2023.  On September 18, 2023, the jury found Mr. Zajac guilty on all three of the charges that had proceeded to trial:  Count 1, a charge under 18 U.S.C. § 844(i); Count 3, a charge under 26 U.S.C. § 5861(d); and Count 4, a charge under 18 U.S.C. § 844(e).

Mr. Zajac has filed a motion entitled "Defense's Rules of Criminal Procedure Rule 29 Petition for Judgement of Acquittal."  Dkt. 1289.  Some of the grounds in the motion, however, would appear to call for a new trial, not a judgment of acquittal—for example, Mr. Zajac's arguments that the Court gave inappropriate jury instructions or failed to give appropriate instructions.  For this reason, the Court will consider the motion as seeking a judgment of acquittal under Fed. R. Crim. P. 29 and, alternatively, as seeking a new trial under Fed. R. Crim. P. 33.

### Discussion

### 1. Applicable standards

When a court considers a motion for judgment of acquittal under Rule 29, it views the evidence in the light most favorable to the government and asks whether any rational trier of fact could have found the elements of the charged offenses beyond a reasonable doubt.  *See, e.g., United States v. Jarigese*, 999 F.3d 464, 470-71 (7th Cir.

2021).  A judge reviewing a jury's verdict "do[es] not second guess jury determinations on credibility unless the testimony is so implausible that it cannot be trusted as a matter of law.  To meet that standard, it must have been either physically impossible for the witness to observe that which he or she claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all."  *Id.* at 471 (internal citation omitted).  In addition, a court does not "reweigh the evidence or invade the jury's province of assessing credibility," and it may overturn the verdict only if "the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt."  *United States v. Rivera*, 901 F.3d 896, 900–01 (7th Cir. 2018).  *See also, e.g., United States v. Medina*, 969 F.3d 819, 821 (7th Cir. 2020) ("[W]e reverse only if we conclude, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt.") (citations and internal quotation marks omitted).

As far as jury instructions are concerned, a court will overturn a conviction and order a new trial "only if the instructions as a whole do not correctly inform the jury of the applicable law and the jury is misled."  *United States v. Chanu*, 40 F.4th 528, 543 (7th Cir. 2022).  If the jury instructions contain an error or misguides the jury, a conviction may be overturned "only if the error prejudiced the litigant."  *United States v. Hilliard*, 851 F.3d 768, 782 (7th Cir. 2017).

**2.      The evidence**

The evidence presented at trial, viewed—as required—in the light most favorable to the government, was sufficient to permit a reasonable jury to find the following.  About 6:53 a.m. on September 1, 2006, an improvised explosive device—a pipe bomb—

exploded inside a metal trash can with an open top that was located inside the Hinsdale Metra station. The sound from the blast was sufficient to perforate the ticket agent's eardrum. Someone pulled the trash can outside the building; its contents were on fire when the first law enforcement officers arrived.

Fragments of PVC pipe, other debris (including a burned model rocket engine), and smokeless powder particles were recovered from inside the trash can and locations scattered inside the train station.[1] Forensic examiners affiliated with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) determined that the explosion was caused by a pipe bomb that was adhered with silicone sealant to cardboard. The bomb was constructed using Mueller brand PVC pipe filled with smokeless powder; a 60-minute red kitchen timer; a 9-volt battery; wires; alligator clips; and an igniter. The government's explosives and bomb reconstruction expert, Danny Waltenbaugh, testified, and a reasonable jury could find, that the timer allowed for a device to be set up for detonation up to 59 minutes after activation. Waltenbaugh testified that the bomb exploded after the timer brought the ends of two wires into contact, sending an electrical current to the igniter, which in turn heated the smokeless powder inside the PVC pipe. As the powder burned, pressure built up until the container could no longer handle it, causing it to explode. Shards would have been sent out in various directions at as much as 300 to 600 feet per second. A fire was also caused by the heat generated from the explosion.

The evidence showed that on October 12, 2006, a letter mailed from Westmont,

---

[1] There was some testimony that a piece of debris from the explosion was found stuck in trim along a wall of the station interior, but this testimony was somewhat equivocal. *See, e.g.*, Trial Tr. at 302.

4

Illinois and bearing a postage meter mark of October 9, 2006 was received by the Hinsdale Police Department. The letter described certain components of the bomb that had not been released to the public, explained why the bomb had been placed, and threatened future bombings that would involve more powerful and deadly devices. The letter, reproduced below in its entirety, stated regarding future bombings that "If it doesn't kill, I will repeat as necessary. Unfortunately, I can't guarantee the death of only one person. But at least one must die, in a public Hinsdale location." Govt. Ex. 1111.



Not too long ago you fucked with the wrong person. This will likely eventually lead the death of at least one Hinsdale citizen. It's up to you. In fairness, I fired a warning shot last month. Let's see if you're bright enough, or possess the character needed to stop this death. I don't believe you do, but my conscience will be clear. Here's the process:

A couple of your goons used their positions as officers to intimidate and harass a non-threatening person in need of their help. As far as they knew, the person's life was in danger. Instead of helping they did what they could to cause as much pain as was possible.

Now it's my turn.       .   .   .

I'll be watching and listening to news of the police department. I won't go out of my way, but if I hear of foul play by your men someone is dead. If I hear of case where your boys repeat what happened to the person described above, the next bomb will be substantially different than the September 1 device. No rocket engine will be in place to warn those standing near. No fuse will allow time to get away. The electronic ignition will effect the powder directly and instantly. And it won't be a small plastic container. It will be a steel case, 6 times the size of the plastic. It will be inside a larger steel case. Between these cases will be lead and steel shards. If it doesn't kill, I will repeat as necessary. Unfortunately, I can't guarantee the death of only one person. But at least one must die, in a public Hinsdale location.       .   .

You have been embarrassed and humiliated by the first experience. The next one will repeat that, many times over. You will also loose standing in the community. False bomb threats will occur afterwards, depleting the Hinsdale public of faith in their police department. But the ongoing costs will be significant as well. You'll be forced to install cameras in public places. This will further remove the comfort and easy living from Hinsdale.

It's up to you asshole. Better sit & talk with your men. I look forward to making the news once more, this time national.

No latent fingerprints were found on the letter. However, eight latent prints were found on the envelope, and one was found on the back of the address label, which

forensic examiners had removed from the envelope for examination. An ATF fingerprint comparison expert testified at the trial that all of these prints matched those of Mr. Zajac.

The government also introduced evidence indicating a motive for Mr. Zajac to commit the crime, a motive that, in turn, linked to statements made in the threat letter. In April 2005—about 17 months before the explosion—Hinsdale police had arrested Mr. Zajac's son Adam Zajac on an outstanding warrant.[2] This occurred after the police had approached Adam Zajac while he was experiencing a medical episode of some sort in the parking lot of a gas station. Mr. Zajac and his then wife, Sharon Zajac, went to the Hinsdale police station to pay the $100 bond that was required to secure Adam Zajac's release. Testimony at trial from a police officer and Sharon Zajac established that Mr. Zajac became "irate" with the police, called them "fucking assholes," tore items off the wall, and told officers, "I know where you work." Mr. Zajac and his wife separated shortly after this—perhaps the next day.

Testimony at trial established that Mr. Zajac's apartment in Oakbrook Terrace was searched pursuant to a warrant on October 27, 2006. Among the items found in the search were granules of smokeless powder visually consistent with Alliant Blue Dot powder, which were found in a shop vac (stuck to a label for a Mueller PVC "bushing"), on the floor in various locations inside the apartment, loose in a tool box, on a funnel inside a kitchen cabinet, on a pair of pliers inside the teeth, and stuck to a sealant on another pair of pliers. There was testimony that commercially-purchased ammunition

---

[2] Mr. Zajac introduced evidence that suggested a supposedly unpaid fine that was related to the warrant actually had already been paid and thus that the arrest resulted from a "glitch." Trial Tr. at 2417-18.

typically does not leak gunpowder, indicating that there had been loose smokeless powder—in other words, smokeless powder acquired as such—in the apartment. There was also testimony that the smokeless powder granules recovered from the Hinsdale train station were also consistent with Alliant Blue Dot smokeless powder—though (contrary to the government's statement in its brief) the government's witnesses did not opine that the granules found at the train station or those at the apartment *were* Alliant double-based smokeless powder or that they "matched" the granules found at the apartment. Rather, the testimony was that the apartment granules and the train station granules both were visually consistent with Alliant Blue Dot powder.

In addition, investigators found that a 1/8-inch drill bit found in Mr. Zajac's apartment had a flake of PVC on its tip. There was no testimony matching the particular PVC flake to the PVC found at the train station, but the evidence was nonetheless significant because there was evidence that the pipe bomb, made from PVC, had a 1/8-inch hole drilled in it.

Investigators also found, on Mr. Zajac's desk inside the apartment, two legal paper pads, each with cardboard backing cut off. There was testimony that cardboard found elsewhere in the apartment had been cut from one of the legal pads. In addition, and significantly, an ATF forensic examiner testified that the cardboard pieces found at the train station attached to the pipe bomb matched what had been cut from the other legal pad found in Mr. Zajac's apartment.

Also located in the apartment was a Dymo label maker. A U.S. Secret Service forensic scientist compared test labels printed from the label maker to the address label found on the threat letter envelope sent to the Hinsdale Police Department. The

scientist testified that there were printing anomalies that were common to both and that the label on the threat letter envelope was consistent with those printed from the Dymo label maker found in Mr. Zajac's apartment.  He did not testify, however, that the label *was printed* from that label maker.

Finally, an ATF forensic scientist found that the white sealant used in making the pipe bomb was chemically and visually consistent with sealant from a tube found in Mr. Zajac's apartment, sealant on green pliers found in the apartment, and sealant on the bottom of a 9-volt battery found in the apartment that had identifying marks scratched off.  The scientist did not testify, however, that the sealant found in the apartment was the same brand as that found at the train station.  The brand could not be identified; the sealant in question is of a type commonly sold as a consumer product.[3]

### Discussion

### 1.    Count 1

Count 1 was a charge under 18 U.S.C. § 844(i), which makes it a crime to "maliciously damage[s] or destroy[s], or attempt[s] to damage or destroy, by means of . . . an explosive, any building . . . or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce . . . ."  18 U.S.C. § 844(i).  Count 1, as charged, identified the property in question as "the Hinsdale Metra Station and accompanying railroad tracks."

Mr. Zajac argues, as he did before and during the trial, that the Court erroneously

---

[3] Mr. Zajac's contention in his reply brief that the government implied in response to his motion that its forensic expert matched the silicone adhesive in the bomb residue with adhesive found in his apartment, *see* Def.'s Reply at 23, is incorrect.  The government argued only that the expert said the two were "consistent."  *See* Gov't's Resp. at 9.  That was, in fact, the thrust of the pertinent testimony by the expert.

lowered the burden of proof on the government via the jury instructions. Specifically, he relies on the fact that the indictment alleged that he "did maliciously damage *and* destroy, *and* attempted to damage *and* destroy" the train station and accompanying railroad tracks. Dkt. no. 1 at 1. The Court's instructions, however, required the government to prove that he maliciously damaged *or* destroyed, *or* attempted to damage *or* destroy" the station *or* the accompanying tracks. Mr. Zajac contends that the instructions' use of the disjunctive was an error on the Court's part.

The Court disagrees. It is well established that, where (as here) the statute disjunctively allows for alternative ways to commit a violation, "the government can charge in the conjunctive and prove in the disjunctive." *United States v. King*, No. 21-1189, at *2 (7th Cir. Apr. 8, 2022) (citing *Turner v. United States*, 396 U.S. 398, 420 (1970)). *See also, e.g., United States v. Jones*, 418 F.3d 726, 730 (7th Cir. 2005); *United States v. Muelbl*, 739 F.2d 1175, 1179–81 (7th Cir. 1984). Thus even though the indictment alleged that Mr. Zajac maliciously damaged *and* destroyed certain property *and* attempted to do so, the government was not required to prove "destruction" or even attempted destruction, but instead could obtain a guilty verdict by proving malicious "damage" or, even, attempted damage.

The same is true as a matter of sufficiency of the evidence. "The general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged." *United States v. Johnson*, 827 F. App'x 586, 590 (7th Cir. 2020) (quoting *Turner*, 396 U.S. at 420).

The evidence, as summarized above, was sufficient to permit a reasonable jury

to find Mr. Zajac guilty. The government's evidence was circumstantial—in other words, there was no direct evidence of his guilt, such as eyewitness testimony, video or audio recordings, or an admission. But the law does not require direct evidence to prove a defendant's guilt. It is beyond debate that "circumstantial evidence is no less probative of guilt than direct evidence." *United States v. Tinsley*, 62 F.4th 376, 387 (7th Cir. 2023)

The evidence, taken (again, as required at this stage) in the light most favorable to the government, was sufficient to permit a reasonable jury to find that Mr. Zajac had a motive to get revenge on the Hinsdale police; he made the pipe bomb, an explosive device, likely in his apartment; he placed it in the train station; he caused it to go off; and in doing these things he maliciously intended to cause damage to the Hinsdale train station. The evidence included (but was not limited to) the otherwise unexplainable presence of smokeless powder granules in his apartment, which were visually consistent with granules found at the train station after the explosion;[4] the presence at his home of legal pads with a cut-off cardboard backing, plus the fact that the bomb was adhered to cardboard pieces that fit the cut-off portion of one of the legal pads; the PVC fragment on a 1/8 inch drill bit that matched the size of a hole drilled in the pipe bomb; the presence in his apartment of other items consistent with those used in the PVC-encased pipe bomb; and last, but absolutely not least, evidence that was sufficient to permit a reasonable jury to find that Mr. Zajac prepared and sent a threat letter to the police that cited the bombing, indicated a motive consistent with the motive evidence offered by the government, and provided non-public details about the device. On the

---

[4] To be more specific, both were visually consistent with Alliant Blue Dot smokeless powder. But the upshot of those comparisons, inferentially, is that the two samples were also visually consistent with each other.

last of these points, the evidence included fingerprints on the envelope and the back of the address label, as well as the visual consistency between printing on the label and printing from the label maker found in Mr. Zajac's apartment.

Mr. Zajac did a creditable job during the trial cross-examining the government's forensic witnesses and attempting to impeach them. But credibility issues are for the jury, not for the Court to second-guess on a post-trial motion, except (as indicated earlier) in the very unusual situation where a witness says something that is physically impossible or defies the laws of nature. Nothing like that took place here.

In his post-trial motion, Mr. Zajac reemphasizes certain aspects of what he views as the flaws, inconsistencies, or non-sequiturs in the physical and forensic evidence. At bottom, this amounts to a challenge to the weight appropriately given to this evidence and, in some situations, to credibility determinations. All of that is perfectly appropriate in arguing a case to a jury, but it is misplaced on a post-trial motion. The Court will, however, review and address the more significant points on this topic made by Mr. Zajac that have not thus far been mentioned.

Mr. Zajac contends that the cardboard pieces found in the train station were not shown to match the area where cardboard was missing from the legal pad found in his apartment, and in one of several exercises of hyperbole, he calls the government's and its witness's testimony regarding the cardboard (or, perhaps, how the cardboard was handled) "clear, obvious fraud." Def.'s Mot. at 18. Relatedly, he argues that ATF case agent Jane Balkema testified that only two pieces of cardboard were found attached to the device in the train station but that at trial, the government displayed three pieces. This, Mr. Zajac appears to contend, establishes that the government somehow

fabricated this evidence. There's also, perhaps, a suggestion that the government or agents might have taken a legal pad from the unopened packet found at the apartment and made up the cardboard evidence introduced at trial.

The latter point is utterly without support. As for the rest of it, the portions of the record that Mr. Zajac cites here do not support the weight he attempts to put on them. First of all, the testimony offered by the government did, in fact, show a close match between the cardboard pieces found at the train station and the missing portion from the legal pad found in Mr. Zajac's apartment.[5] Second, though agent Balkema testified at one point that there were two cardboard pieces attached to the device remainder found at the train station, one of which was folded over, *see* Trial Tr. at 419, her initial testimony was that the items in GX 2—which included the bomb debris—were in substantially the same condition as when she observed them in the train station trash can on September 1, 2006. *See* Trial Tr. at 206. The items in exhibit 2 included three pieces of cardboard. In addition, on further examination agent Balkema testified that she did not believe that the cardboard pieces examined during the trial were previously a larger piece, *see id.* at 432, and the most she said that theoretically could support Mr. Zajac's claim is that she "thought" the cardboard was initially folded, *see id.* at 422-23, which is far less than definitive. Altogether, the point was not really developed during the trial testimony. One way or another, there is no support for Mr. Zajac's contention

---

[5] There were some spots where the overlaid cardboard pieces appeared to extend ever so slightly beyond the bounds of the paper when placed back on the legal pad, but any differences were explained by testimony that the pieces at the train station crime scene had been softened by water—testimony the jury was entitled to accept. The Court also recalls that during cross-examination, Mr. Zajac placed the pieces in a different way on the same legal pad, and they actually fit even more precisely. *See* Trial Tr. at 1439-41.

that there was alteration or fabrication of this evidence.

Mr. Zajac also points out, correctly, that the government's forensic witnesses were not able to *chemically* match the smokeless powder granules found in his apartment with the granules found at the train station and that there was no PVC plastic matching the device material found at his apartment.[6]  The short answer is that the government was not required to offer such testimony in order to sustain its burden of proof.  Its case was based on circumstantial evidence, which typically involves viewing the evidence as a whole, not as a bunch of discrete parts.  Even without these sorts of matches, the circumstantial evidence, as summarized earlier, was sufficient to permit a reasonable jury to find Mr. Zajac guilty.

Mr. Zajac also discusses, at some length, claimed weaknesses and what he contends is "fraud" or fabrication regarding the fingerprint testimony.  The Court will address more directly in the section of this opinion regarding the threat letter charge, Count 4.  At this point, it suffices to say that the points Mr. Zajac makes involve matters of the appropriate weight to be given to the testimony, which is the province of the jury, not the Court.  There was nothing about the government's fingerprint testimony that precluded a reasonable jury from relying on it.

The Court has also considered Mr. Zajac's other points regarding the forensic testimony, predominantly that there was no definitive match between items found in his apartment—smokeless powder granules, alligator clips, silicone sealant, and a scrap of

---

[6] The one possible exception was the small PVC fragment found on the aforementioned drill bit.  There was no testimony, however, that there was a chemical or compositional match between this fragment and the fragments found at the train station crime scene. As best as the Court can recall, there was no testimony that any testing was done to attempt to see if there was a match.

PVC material—and items found in the debris from the explosion. The short answer is that no definitive match was either claimed or required. The government offered evidence, and argued, only that these items were consistent with the items in the explosion debris. This evidence, though not definitive if considered on an item-by-item basis, was appropriately relied upon by a reasonable jury, in connection with other evidence, to support Mr. Zajac's guilt.

Turning to Mr. Zajac's other arguments, he contends that the evidence was insufficient to establish even attempted damage to the train station. For this he relies on testimony suggesting that the pipe bomb was not actually powerful enough to cause actual damage. This was certainly a legitimate point for the jury to consider, but it does not carry the day on a motion for judgment of acquittal. It basically amounts to an argument that a bomb maker who turns out not to be skilled enough to make a sufficiently destructive bomb can't possibly have attempted to "damage" property by setting the bomb off. That's absurd. As the government correctly argues, this argument "conflates the device's capability with the builder's intent." Gov't's Resp. at 16.

But that aside, there was evidence that permitted a reasonable jury to find that the pipe bomb did have the capability of causing damage to the train station, and not simply the trash can (regarding which there was testimony of *actual* damage). Specifically, the testimony regarding the speed at which fragments travel following an explosion, as well as the common outcome that an explosion of an improvised device can cause a fire—which actually occurred here—was sufficient to establish that the bomb had the capability of causing damage to the train station. The fact that a person inside the station suffered a perforated eardrum from the explosion also supported this

14

proposition. And government expert witness Waltenbaugh so testified: he said that depending on several unpredictable factors, fragments from the pipe bomb could have traveled fast enough to cause damage to nearby windows or walls. *See* Trial Tr. at 591-92, 607-09, 692-93. Mr. Zajac points out that previous testimony by Waltenbaugh at an earlier proceeding indicated otherwise, but determination of the weight to be given to testimony and assessment of impeachment are matters within the jury's purview, not for the Court to reassess on a post-trial motion.[7] There is no basis in the record to determine that Waltenbaugh's trial testimony on this point amounted to physical impossibility or defying the laws of science.

Mr. Zajac cites page 684 of Waltenbaugh's testimony, but there Waltenbaugh testified that the device was not "strong enough to cause the walls to be *seriously* damaged," Trial Tr. at 684 (emphasis added), not that it was not strong enough to cause any damage to the station *at all*. Neither the statute, nor the indictment, nor the jury instructions required the government to prove the device was capable of causing *serious* damage.

Mr. Zajac's contention that the actual impact (or lack thereof) from the pipe bomb going off establishes that it was not actually an "explosive device" is, quite simply, wrong—not to mention that his argument requires construing the evidence in *his* favor,

---

[7] Mr. Zajac cites Waltenbaugh's testimony from a pretrial *Daubert* hearing held when the case was still assigned to Judge Dow, at which Waltenbaugh testified, in substance, that there was no attempt to damage the train tracks or station walls. *See* Def.'s Mot. at 25. But no such testimony was offered at trial. Nor could it appropriately have been offered. Attempt—as accurately described in the instructions to the jury—includes the proposition that the person *intended* to bring about the result, in this case damage to the train station or tracks. *See* Dkt. no. 1246 at 18. Thus testimony by Waltenbaugh that there was no "attempt" necessarily would have to include an opinion regarding the perpetrator's mental state. This is precluded by Federal Rule of Evidence 704.

which is the opposite of the legally applicable standard. Waltenbaugh's testimony was sufficient to permit the jury to find that the device did, in fact, explode due to the expansion of gases from the combustion of the material it contained—it is undisputed that the PVC container shattered into many fragments—and that is enough to make it an explosive device. Again, and contrary to Mr. Zajac's argument, this device was nothing like a store-bought consumer firework like an M-80. It was a carefully (if not, perhaps, skillfully or well) constructed device made from components that had to be acquired and put together in a way that would allow the device to explode. The fact that, once built, it didn't produce an explosion stronger than a commercially available firework does not provide Mr. Zajac with a defense or suggest that the government failed to meet its burden of proof.

And all of that aside, the evidence was sufficient to permit the jury to find that the person who placed and triggered the bomb *believed* it sufficient to cause property damage and acted maliciously in building and in placing it—which would be sufficient to satisfy the elements of an attempted offense under section 844(i). This is so based on the construction of the device (it wasn't simply a common "firework" but instead was an improvised device whose construction inherently reflects that its maker intended it to go off); the placement of the device in a relatively small room reasonably likely to be populated; and the existence of a motive, supported by the evidence, to obtain revenge upon Hinsdale for its police officers' alleged mistreatment of Adam Zajac.

In sum, the evidence was sufficient to permit a reasonable jury to find that the pipe bomb was an explosive device and that the person who placed it in the train station maliciously intended to cause damage to the station and took a substantial step toward

16

doing so by placing the pipe bomb and causing it to be set off. An "attempt," as correctly set out in the jury instructions, requires the government to prove that the defendant took a substantial step toward damaging the building by means of an explosive, with the intent to cause damage. *See* Dkt. no. 1246 at 18-19. It does not require the crime to succeed. Specifically, the absence of success is not a defense to a crime involving an attempt. *See, e.g., United States v. King*, 126 F.3d 987, 994 (7th Cir. 1997); *United States v. Corfman*, 94 F.3d 330, 333 (7th Cir. 1996). *See generally Spies v. United States*, 317 U.S. 492, 498-99 (1943).

Mr. Zajac also challenges the sufficiency of the evidence offered to show that *he* placed the device in the train station. The Court begins, however, with the legal issue of "alibi" and its declination of Mr. Zajac's tendered "alibi" instruction relating to Count 1. That proposed instruction, taken from the Seventh Circuit Criminal Jury Instructions, stated as follows:

> You have heard evidence that the defendant was not present at the time and the place where the crime is alleged to have been committed. It is the government's burden to prove beyond a reasonable doubt each and every element of the offense, as I have identified those elements, *including that the defendant was present at the time and place that the offense is alleged to have occurred.*
>
> If, after you consider all of the evidence in the case, you have reasonable doubt *about whether the defendant was present at the time and the place where the crime actually occurred*, then you must acquit him.

*See* Dkt. no. 1172 at ECF p. 53 of 60 (emphasis added).

The italicized portions of this instruction reflect why the Court did not err in declining to give it. Count 1 was not an offense where the government had to prove that the defendant was present at a particular place *at a specific time*. The charged offense

was not, for example, similar to a bank robbery—where, to commit the robbery, the charged person *has to be there at the moment of the robbery*—or a firearm possession offense, which likewise tends to require proving that the defendant was at a particular place and time where the firearm was found. Here the charged offense simply required Mr. Zajac to have maliciously attempted to damage the train station on September 1 by means of an explosive, not to have been present at the station a particular moment in time.

But more broadly, and more importantly, the explosive device had a timer and could have been set off as much as 59 minutes before it actually exploded, i.e., any time from a little after 5:53 a.m. up to just before 6:53 a.m. on the date in question. The steps needed to start the timer could have been performed anywhere within that range. Mr. Zajac's proposed instruction did not take this into account; the instruction assumed that the government had to prove his presence at a particular spot at a particular moment in time, which was not the case. Thus the instruction was not a correct statement of the law as applied to the case.

In any event, the failure to give an instruction, or the giving of an erroneous instruction, amounts to reversible error only if the jury was misled and the defendant was harmed by the failure to give the instruction. *See Chanu*, 40 F.4th at 543; *Hilliard*, 851 F.3d at 782. This did not happen here. The instructions to the jury unequivocally communicated that the government had to prove that *Mr. Zajac* maliciously attempted to damage the train station by using an explosive. *See* Dkt. no. 1246 at 18. The law presumes that jurors follow the Court's instructions, *see, e.g., United States v. Smartt*, 58 F.4th 358, 363 (7th Cir. 2023), and there was no way, under the instructions as given,

that the jury could have convicted Mr. Zajac based on a misunderstanding of the legal requirements; under the instructions, the jury had to find that *he* maliciously attempted to damage the train station by using an explosive.

Mr. Zajac's claimed "alibi" is also deficient as a factual matter—at least on a motion for judgment of acquittal, where the Court is required to view the evidence in the light most favorable to the government. Mr. Zajac cites testimony by his sister Nancy Monahan to the effect that she recalled seeing him at their parents' home in Country Club Hills when she arrived there on the morning of September 1, 2006. She said that she "would normally arrive between 6:20 and 6:30." Trial Tr. at 2484. Mr. Zajac contends, or at least appears to contend, that this would have prevented him from being at the train station at a relevant time.

But Monahan did not testify regarding the specific time she arrived there on September 1, 2006. Rather, she testified regarding her usual practice, and the jury was entitled to discount her testimony accordingly. That aside, testimony offered by the government tended to show that, even traveling at or in some areas below the speed limit, it took just 40 minutes to get from the train station to Mr. Zajac's parent's home. That would have enabled him to place the pipe bomb at the train station and set the timer for the maximum available time and still arrive at his parents' home at or close to 6:30 a.m., at or very close to the time when Monahan testified she saw him there.

In addition, the jury was not required to credit Monahan's testimony about seeing Mr. Zajac that morning, let alone the time she estimated. In addition to the fact that the jury could have found that she had a motive to favor her brother Mr. Zajac, there was this: on cross examination, Monahan admitted that she had testified under oath in

2009—*way* closer to the events—that she did not recall where she was on September 1, 2006 and that she didn't believe she had spent any time with Mr. Zajac "that weekend" (the Court acknowledges that September 1, 2006 was a Friday, but that day arguably marked the start of the Labor Day holiday weekend). *See* Trial Tr. at 2499-2500. No other witness put Mr. Zajac at his parents' home on that specific day: his sister Mary Feldmeier said she did not arrive at their parents' home until 8:30, 9:00, 0r 9:30 a.m. and that she was the only sibling there when she arrived. *See* Trial Tr. at 2533.

Mr. Zajac appears to argue that because—as he contends—there was no igniter on the pipe bomb, it had to have been placed and triggered *just* before it actually went off—and if this is so, and if one accepts Monahan's testimony at face value, he could not have been the person to place and set off the bomb. There are at least two big problems with this argument. The first the Court has already discussed: the jury was not required to accept Monahan's testimony regarding the events of the morning of September 1. The second problem is the contention that the evidence showed there was no igniter. That is incorrect. What it showed, as the Court recalls, was that no electronic igniter was *found* in the debris. But Waltenbaugh opined during his trial testimony that an igniter had been part of the device, and he explained why an igniter, though present in the device, might not have been found in the debris. The jury was entitled to accept Waltenbaugh's opinion on these and other points; again, his testimony did not require accepting the physically impossible and did not defy the laws of

science.[8]

In sum, Mr. Zajac's "alibi" contention does not entitle him to a judgment of acquittal.

Relatedly, Mr. Zajac defended the case at trial, in part, by pointing to a plausible alternative suspect, namely his son Adam Zajac. He supported this, in part, by testimony from Adam Zajac that suggested he was house-sitting for Mr. Zajac in the days just before the threat letter was sent to the Hinsdale police—thus suggesting that it was Adam Zajac, not Mr. Zajac, who authored and sent the letter. Mr. Zajac also supported his alternative-suspect theory with testimony from his sisters and a brother-in-law who identified Adam from a photograph of persons standing near the crime scene at an unspecified time not long after the bomb went off (there was crime scene tape in the foreground). And Adam Zajac was the person who allegedly had been mistreated by the Hinsdale police in 2005 (though there is no evidence that he went off on them, unlike Mr. Zajac), meaning that he, too, had an arguable motive for revenge. Mr. Zajac also offered other evidence that potentially connected Adam Zajac to materials or skills that could have been used to construct a pipe bomb.

But although this was a plausible defense theory for Mr. Zajac to argue to the jury, the jury was not required to accept it, and the standards for deciding post-trial

---

[8] On the subject of model rocket engines, Mr. Zajac references comments and proposed testimony to the effect that a model rocket engine is not a weapon. *See* Def.'s Mot. at 31-35. Perhaps so, but that's irrelevant. The issues to be tried did not call for government to prove, or the jury to determine, that *particular components* of the pipe bomb were weapons. On Count 2, the instructions to the jury stated that " A destructive device does not include any device that is neither designed nor redesigned for use as a weapon," Dkt. no. 1246 at 21, but that concerned the device as a whole, not its component parts.

motions do not permit the Court to second-guess the jury's assessment. On this point, the jury heard, during the government's rebuttal case, testimony from Mr. Zajac's daughter (Adam's sister), who said that on the morning of September 1, 2006, he was with her at or on the way to the college she was attending in Nebraska, and that Adam was not the person shown in the photos that from which the other witnesses had identified him. Even without that, the jury was not required to believe the testimony of the witnesses called by Mr. Zajac. And all of that aside, Adam Zajac's presence near the train station crime scene at some point after the bomb had gone off and the fact that he may have been at Mr. Zajac's home by himself in the days before the threat letter was mailed does not conclusively establish his responsibility for the crime.

Two last points on this. Mr. Zajac argues that the government subpoenaed Adam and Sharon Zajac for rebuttal testimony, but "they both declined to take the stand." Def.'s Mot. at 47. There is no support in the record for that. What the record reflects is that the government elected not to call these witnesses in rebuttal. In fact, as to Adam Zajac, the Court specifically asked the government whether Adam had declined to testify. The government responded that he had not so declined. Trial Tr. at 2651. There is no basis in the record to believe this response was untrue.

In his reply brief, Mr. Zajac goes further: he says that "*The court*, no doubt, has a *self-serving explanation* ready as to why Sharon and Adam Zajac declined to testify in the August 2023 trial over Adam's person seen in a depot photo . . . . *The court refused to divulge* why, when under subpoena, . . . both Adam and his mother, Sharon Zajac, declined to deny it is not Adam at the depot. *This silence summarized the character of the court throughout this case*." Def.'s Reply at 2 (emphasis added).

There is so much wrong with these comments that it is difficult to know where to start. First of all, the Court doesn't call witnesses, doesn't decide when not to call them, and isn't privy to information regarding why particular witnesses are and aren't called. The calling or non-calling of Adam and Sharon Zajac as rebuttal witnesses wasn't up to the Court; it was up to the prosecution (i.e. the government). Mr. Zajac did not ask the Court to elicit from the government an explanation for why it did not call these witnesses in rebuttal, and there was no occasion for the Court to do so unprompted: again, it's up to the parties, not the Court, to determine which witnesses to call. And Mr. Zajac's statement that "the court, no doubt, has a *self-serving* explanation" for the non-calling of these witnesses is downright bizarre. The Court had, and has, no interest in which witnesses any party chose to call, or why.[9] And Mr. Zajac's pejorative comments regarding "the character of the court" are not worthy of a response.

The last point regarding the alibi/alternative perpetrator issue involves another passage in Mr. Zajac's reply brief. There he posits a scenario in which FBI agents visited him in October 2006 and "voiced an awareness of my person as it pertained to the Hinsdale depot event only" and gave him a "message" that "any further similar events would have dire consequences to those involved" and that the FBI did not intend

---

[9] The Court inquired of the prosecution in open court on September 15 whether Adam Zajac had claimed the privilege only because the government had advised in open court, earlier, that he had elected to consult with an attorney when asked to return to court to testify, and that attorney, a lawyer with the Federal Defender Program, had appeared in the gallery, presumably to observe the proceedings. The Court made this inquiry because it was of the view that if Adam Zajac *had* claimed his privilege against self-incrimination, this might be exculpatory material that the government would be required to disclose to the defendant. It's quite odd that Mr. Zajac seems to have twisted this inquiry by the Court into some sort of conspiracy in which he posits that *the Court* has—to use his words—a "self-serving" reason for the government not to call a witness.

to pursue the matter "under the current circumstances of 'no-harm, no-foul.'"  Def.'s

Reply at 1.  Mr. Zajac goes on to say that he then "immediately contacted" Adam Zajac

and "instructed [him] to make no incriminating comments to his father" and made him

aware of the FBI meeting, and that "[t]here were assurances from Adam that no further

activity of the depot kind would occur *to the extent he could control such.*"  *Id.*

(emphasis in original).

The short answer to Mr. Zajac's positing of this scenario is that there is no

support for it in the record of the trial.  The Court's consideration of the sufficiency of the

evidence is, and can only be, based on evidence that was admitted at the trial and the

inferences drawn from that evidence, not a scenario posited by a party that has no

support in the trial record.  This discussion by Mr. Zajac is not properly considered in

deciding whether to grant a judgment of acquittal or a new trial.

## 2.    Count 3

Count 3 of the indictment (renumbered for trial purposes as Count 2 because of

the dismissal of the original Count 2) was a charge under 26 U.S.C. § 5861(d).  The

indictment alleged that Mr. Zajac "did knowingly possess a destructive device as defined

in United States Code, Sections 5845(a) and (f), namely: an explosive destructive

device commonly referred to as a pipe bomb, which destructive device was not

registered to the defendant in the National Firearms Registration and Transfer Record."

Dkt. no 1 at 3.  The jury instructions' definition of "destructive device" defined that term

as follows:

> The term destructive device includes any explosive or incendiary bomb or
> device similar to an explosive or incendiary bomb.  In addition, any
> combination of parts designed or intended for use in converting any device
> into an explosive or incendiary bomb or similar device and from which a

> destructive device may be readily assembled constitutes a destructive
> device.  A destructive device does not include any device that is neither
> designed nor redesigned for use as a weapon.

Dkt. no. 1246 at 21.

Mr. Zajac's arguments for a judgment of acquittal on this charge overlap to a significant extent with his arguments regarding Count 1.  In particular, he contends that the device could not have been a "destructive device" because it lacked the actual capacity to damage or destroy.  But the evidence permitted a reasonable jury to find otherwise—in particular, the testimony of government explosives expert Waltenbaugh, who testified that it did have the capacity to cause damage if exploded and that whether it actually did so depended on a number of variables.  The Court also notes that based on the trial testimony, the absence of actual damage from the explosion was at least partly attributable to the fact that it was placed inside a trash can.  Count 2, however, involved the capacity of the device itself, without regard to the particular location in which it was set off.  The evidence permitted a reasonable jury to find that the device, without the trash can, was capable of causing more damage.

Mr. Zajac appears to argue that the device was no more powerful than some types of fireworks available to consumers.  But this was not a firework that had been purchased in a store, from a dealer, or from a friend; the evidence showed that it was an improvised device that was built to cause an explosion.  Any in any event, there is no "more powerful than consumer fireworks" test under section 5861(d) or the underlying definitional statutes.  The fact that the pipe bomb's actual capacity arguably was no greater than some fireworks available for consumer purchase is of no consequence with regard to whether there was a violation of section 5861(d).

25

In addition, the evidence, discussed in detail earlier, was also sufficient to permit a reasonable jury to find that Mr. Zajac, and not someone else, made and possessed the pipe bomb. The evidence was also sufficient to permit a reasonable jury to find that the pipe bomb was *not* a device that was not designed for use as a weapon—the commonly understood definition of "weapon" being a device or thing that is used or intended to inflict damage or bodily harm.

For these reasons, Mr. Zajac is not entitled to a judgment of acquittal or a new trial on the section 5861(d) charge. Nor is he entitled to a new trial due to the Court's failure to define the term "weapon" in the jury instructions. As the government argues, terms that are within the common understanding of a juror do not require elaboration by the court. *See United States v. Durales*, 929 F.2d 1160, 1168 (7th Cir. 1991). And that aside, the instruction Mr. Zajac proposed was an incorrect statement, he proposed a definition for a "deadly or dangerous" weapon, which the government was not required to prove. *See* Dkt. no. 942 at ECF p. 25 of 4 .

**3.    Count 4**

Count 4 of the indictment, which was renumbered as Count 3 for purposes of the trial, charged a violation of 18 U.S.C. § 844(e). The indictment alleged that on or about October 9, 2006, Mr. Zajac, "though the use of the mail, willfully made a threat to the Chief of the Hinsdale, Illinois Police Department, to kill, injure, and intimidate individuals, and unlawfully to damage and destroy real and personal property by means of an explosive." Dkt. no. 1 at 4. Mr. Zajac does not dispute that the contents of the threat letter sent to the Hinsdale Police Department met the requirement of a threat to harm individuals and/or damage property by means of an explosive. Nor does he contest that

whoever sent the letter acted willfully.

Mr. Zajac's contention regarding Count 4 focuses on the sufficiency of the evidence to prove that *he* was the person who wrote and sent the threat letter. On this point, Mr. Zajac cites (among other things) testimony that Adam Zajac was watching his apartment on October 6-7-8, 2006, which was just before the October 9 date on which the letter was mailed, and that the location where the letter's envelope was postmarked by a postage meter was relatively close to where Adam Zajac was living at the time. These were certainly points that Mr. Zajac was entitled to argue to the jury, but they are not a basis to overturn the guilty verdict. The jury was entitled, based on the testimony regarding the address label comparison,[10] Mr. Zajac's motive (including his meltdown at the Hinsdale police station), and fingerprint comparison, to find that Mr. Zajac, and not someone else, wrote and sent the letter. The fact that one might have viewed the evidence in another way is not a basis for a judgment of acquittal; the weight to be given to evidence is a matter within the province of the jury, not the Court. In particular, Mr. Zajac's argument in his motion that his abusive interaction with Hinsdale police in April 2005 is better attributed to his negative mood arising from his impending breakup with his then wife is misplaced on a post-trial motion. Which of alternative reasonable inferences to draw from evidence is a determination for the jury, not the Court.

Mr. Zajac contend the only evidence connecting him with the letter was the fingerprint comparison testimony. That's not correct. Aside from the testimony

---

[10] The Court, again, notes that the government's forensic witness did not testify that the label on the threat letter envelope was a "match" to labels printed from the label maker in Mr. Zajac's apartment, but only that the printing was "consistent." But this was, nonetheless, one piece of evidence that the jury reasonably could rely on, together with other evidence, to find Mr. Zajac guilty.

regarding the printing on the label—which, the Court acknowledges, was identified not as a "match" but rather as "consistent" with labels made from the label maker in Mr. Zajac's apartment—there is also the threat letter's contents. The contents of the letter connect it with the person who planted the bomb in the Hinsdale train station, which in turn is connected to Mr. Zajac through additional circumstantial evidence, as the Court has discussed.

On the question of fingerprints, Mr. Zajac contends, as he contended during the trial, that the fingerprint comparison testimony was infirm. The Court acknowledges that some of the latent prints that were recovered were to some extent blurry or smudged and that this might reasonably affect the believability or weight to be given to the government's fingerprint comparison expert testimony. But as the Court has repeatedly noted in this decision, believability and weight issues are within the jury's province. The Court cannot say that the jury could not reasonably accept the government's fingerprint comparison testimony.

The same is true with regard to Mr. Zajac's arguments regarding the fingerprint found on the back of the threat letter address label. Mr. Zajac goes several steps further here, arguing that the evidence was altered or fabricated and, in his reply, accusing the Court of being in on the fabrication. Here's what Mr. Zajac says on this in his reply, quoted word for word: "The only way to explain the difference between the 2006-2007 image to the actual physical label provided in trial *is that the court substituted the original label with a fake label image*." Def.'s Reply at 13 (emphasis

added).[11]  That's beyond ridiculous.  First of all, at no point before or during the trial did

the Court have custody of any of the exhibits.  The exhibits were—as has been the

practice in this District for all of the 42-plus years the undersigned judge has been a law

clerk, practicing lawyer, and judge here—kept and maintained by the parties.  During

the trial, the exhibits were, again, not ever in the Court's possession or custody but,

instead, were presented to the jury by the parties.  This was done via the courtroom's

evidence presentation system.  Exhibits were presented through that system from the

laptop of the government's counsel, or from the laptop of Mr. Zajac's standby counsel,

or from the "Elmo" (a higher tech version of an overhead projector), or, in some

instances, by counsel or standby counsel handing them directly to witnesses.  They

were *never* presented by the Court.  Mr. Zajac knows this full well—he was there.  The

Court's function, with regard to exhibits presented through the evidence presentation

system via laptop or the Elmo, was limited to clicking on the appropriate "button" on an

electronic control panel to direct whether or not, and when, the witness and jury could

see the exhibits (based, generally speaking, on whether the particular exhibit had been

admitted into evidence).  A photo of the control panel appears below:

---

[11] This reference to "the court" cannot be chalked up as a mistake on Mr. Zajac's part;
his reply brief is replete with similar references.



The Court's use of this control panel is reflected at dozens, if not hundreds, of spots in the trial transcript. At some points, mercifully few, the Court clicked the wrong button and had to then click the right one, as seen from comments at various points during the testimony. But the Court never had, and never altered, any of the exhibits. Mr. Zajac's repeated accusations to the contrary are, at best, reckless.

That aside, the jury was entitled to rely on the address label fingerprint testimony and to reject Mr. Zajac's attacks on it. These largely (though not entirely) boil down to the fact that notations and drawing made on the label appear to be flip-flopped or otherwise reversed in different iterations of the label that were introduced into evidence. This was pointed out during the trial—by Mr. Zajac during cross-examination—but the jury was not required to accept his contentions about what the label and fingerprint

showed or did not show.[12]  Mr. Zajac discusses this particular fingerprint in greater detail

in a separate motion he filed after the present motion for judgment of acquittal, and the

Court may address the point further in considering that motion.  But based on the

briefing on Mr. Zajac's motion for judgment of acquittal, his contentions regarding the

address label fingerprint do not provide a basis to overturn the verdict on any charge or

to order a new trial.  The Court also notes that even without the testimony about this

particular fingerprint, the other evidence (taken, as required, in the light most favorable

to the government) would be sufficient to permit a reasonable jury to convict Mr. Zajac

on each of the three counts.

## 4. Other points

The Court addresses last certain other points raised by Mr. Zajac in connection

with his motion that do not fit neatly into the other sections of this opinion.

First, Mr. Zajac, in his reply brief, appears to take issue with the Court's grant of a

mistrial in January 2023.  *See* Def.'s Reply at 3-8.  This argument, which was not

---

[12] In his reply, Mr. Zajac asserts that during the trial, "the Court attempted to minimize the importance of the fingerprint fraud.  The Court's last words were an order that the issues of label print fraud may no longer be discussed."  Def.'s Reply at 18.  Again, that's wrong, as the record (quoted at length by Mr. Zajac in his reply) shows.  During Mr. Zajac's cross-examination of government witness Lewis, *Mr. Zajac* asked for a sidebar, *see id.* at 15 (quoting the trial transcript), and at sidebar he raised an issue regarding the provenance of the address label fingerprint exhibits.  The Court asked the government to explain the claimed discrepancy, and the government's counsel attempted to do so.  *See id.* at 16 (quoting the trial transcript).  Mr. Zajac then asked to "make note" of a particular point; the Court said "Okay.  You've made your point on that"; there as further discussion by Mr. Zajac; the Court then said, "Okay.  Fine.  You've done what you're going to do."  *Id.* at 17 (quoting the transcript).  *Mr. Zajac* then said, "All right.  We'll move on then."  *Id.*  That's *anything but* an "order [by the Court] that the issues of label print fraud may no longer be discussed."  And in fact Mr. Zajac didn't take the Court's comments as a bar on further discussions; he discussed the fingerprint issue *at length* during his closing argument to the jury.  *See* Trial Tr. 2734-40 ff.

contained in Mr. Zajac's opening memorandum, is waived or forfeited for that reason. Even if not forfeited, any contention that there was something wrong with the declaration of a mistrial lacks merit. The January trial began with a total of 15 jurors—12 regular jurors and 3 alternates. One was excused due to illness within a day; no objection was interposed to excusing this juror. As discussed earlier on the morning of the fourth day of the trial, a second juror reported (and confirmed with a photograph) that he had tested positive for COVID-19. That juror had to be excused; again, there was no objection. This left just 13 jurors.

At that point, the Court discussed with the parties, including Mr. Zajac, the appropriate steps regarding how to deal with the other jurors. The January trial was one of the first conducted in the District after it had lifted its COVID-19-related restrictions and procedures regarding jury trials, which had included daily testing of jurors, 6-foot spacing at all times (both in the courtroom and outside), and mandatory face masking. During the COVID restriction period, when a juror tested positive for COVID, the standard practice in the District was to advise the other jurors so they could determine their degree of contact with the COVID-positive juror and give them the opportunity to opt out of the remainder of the trial. During the period from August 2020 through December 2022, although there were several jury trials in the District in which one or a small number of jurors tested positive, no trials had to be stopped, because—largely due to the stringent spacing and safety restrictions—other jurors were comfortable with continuing their participation.

When the juror reported on the fourth day of the January 2023 trial that he had tested positive for COVID-19, the Court discussed with the parties (including Mr. Zajac),

in advance, what should be done. The Court's proposal was to advise all of the jurors, as a group, that a juror had tested positive and identify who it was; tell the jurors that, going forward, the Court would adopt 6-foot spacing both in the courtroom and during breaks, to give the jurors a greater degree of comfort; and then give the jurors, individually, an opportunity to opt out. Both sides, including Mr. Zajac, agreed to this approach.

Unfortunately, after the Court spoke with the jurors, 4 of the 13 remaining jurors asked to be excused due to the risk to their health. The Court thereafter excused these jurors. Mr. Zajac did not object; neither did the government. The Court had discussed with the parties in advance of this process what would happen if fewer than 12 jurors remained. Under Federal Rule of Criminal Procedure 23(b), a trial may proceed with a jury of fewer than 12 only if both sides agree. Mr. Zajac agreed to go as low as 6 jurors. The government did not agree to proceed with fewer than 12 jurors. That was its right. At that point, the Court had no choice but to declare a mistrial. No objection was interposed, either by Mr. Zajac or by the government.

The bottom line is that the January 2023 trial ended in a mistrial not due to some sort of nefarious plan by the Court to prejudice Mr. Zajac or benefit the government, but rather as the result of juror illnesses and the risk of harm to other jurors of exposure to COVID-19. The Court did not err in declaring a mistrial.

Next, and again only in his reply, Mr. Zajac launches into an attack on the Court on multiple fronts. First, he spins a theory regarding his previous case in the District of Utah, claiming that because the Utah judge allowed evidence on the Hinsdale bombing to be admitted once Mr. Zajac was indicted in the present case, "the court"—i.e., the

undersigned judge—"was compelled to obtain a Hinsdale conviction, vindicating Utah's use of Hinsdale evidence." Def.'s Reply at 3. Mr. Zajac says that Judge Dow "did not know what to do with this case" but that the undersigned judge "was eager to take it to trial," and now "[t]he remaining challenge to the court is to find a plausible excuse to give the defendant a sentence consistent with the Utah sentence, so not to put the long Utah sentence in question. For this, *the court searched for, and found* an unsolved case to accuse the defendant." *Id.* (emphasis added).

Apparently Mr. Zajac believes that judges are involved in instituting criminal charges. They aren't, and of course this Court—neither the undersigned judge nor Judge Dow—was in no way involved in "finding a case" or "accusing" Mr. Zajac. Those functions were carried out by the prosecution. That side, the supposed motivation for the claimed plot against Mr. Zajac—to convict him to avoid a question about the Utah sentence—doesn't even make sense: the Utah sentence is now beyond challenge, as the time for any appeals or motions under 28 U.S.C. § 2255 ran out years ago.

Next, as indicated earlier in this opinion, Mr. Zajac's reply repeatedly refers to the government's response to his motion as "the court's" response and to the government's arguments as "the court's" arguments. Of course they aren't; the Court had no role in preparing the government's response to Mr. Zajac's motion. Mr. Zajac also accuses the Court of "sell[ing] out its integrity," *id.* at 11, of having a "low[ ] level of ethics," *id.* at 25, of "accept[ing] fraud and perjury," *id.* at 26, and of committing "raw fraud by the court." *Id.* at 19. None of these comments are worthy of a response, other than to say that they are wrong.

Two final points. First, Mr. Zajac makes an extended argument in his reply

34

arising from DX 601-16, a series of e-mails between some of the government investigators, including agent Balkema. *See* Def.'s Reply at 18. Without getting into the details, the upshot of the argument is to attempt to debunk the proposition that there was a "match" between the smokeless powder granules found in Mr. Zajac's apartment and those found in the train station and that both *were* Alliant Blue Dot smokeless powder. The short answer is that this was not the evidence at the trial. In this regard, the statement in the government's response that its expert "determined that defendant had traces of Alliant double-base smokeless powder—the same powder used in the pipe bomb," Gov't's Resp. at 8—is incorrect. The testimony at the trial was that the granules found at the train station and those found in the apartment were both "visually consistent" with Alliant Blue Dot powder, *see, e.g.*, Trial Tr. at 1239-40, 1266-67, 1286. Visual consistency is not the same as a chemical match.

The exhibit that Mr. Zajac attaches to his reply, DX 601-16, is an exchange of e-mails between ATF investigators, Michelle (Reardon) Evans, the forensic chemist who testified on the "visually consistent" point at the trial, and case agent Jane Bakema. The e-mail exchange reflects the following:

- Evans looked at a particular smokeless powder sample ("04N0565") and found it insufficient for comparison because it had only "one partially burned blue identifier." DX 601-16, bottom e-mail.

- The case agent, Balkema, asks the chemist whether, if Balkema purchased a canister of Blue Dot powder from stores where she believed the product used in the pipe bomb may have been purchased, the chemist would be able to do a comparison with a different sample ("06N0507") "to determine if it comes from

the same lot number" as the purchased canister. DX 601-16, middle e-mail.

- Evans, the chemist, replies as follows: "Smokeless powder analysis is limited to a device-to-device or suspect-to-device comparison. Comparing powder from a store to a device will not be productive, as there are too many variables to consider. When you have a suspect that has a canister of Blue Dot, then I will attempt a comparison between the suspect's powder and 06N0507. I am sorry I cannot be more help in this area! . . ." DX 601-16, top e-mail.

Mr. Zajac, in his reply, appears to take this as an admission that the visual comparison that Evans testified about a trial—between samples recovered from his apartment and/or the crime scene on the one hand, and a store-bought product on the other—is infirm—actually, as Mr. Zajac puts it, "raw fraud by the court." Def.'s Reply at 19. First of all, if there was an inconsistency between Evans's earlier statements and her trial testimony, that was a point to be explored on cross-examination and discussed in argument to the jury, not a basis for the Court to vacate the conviction. But it does not appear to the Court that there *is* an inconsistency. Balkema's e-mail asks Evans whether she would be able to do a comparison between a particular sample and the store-bought product "to determine if it [same] from the same lot number." DX 601-16. Evans replies in the negative. *But that is not the comparison Evans testified about at trial*; she testified only regarding visual consistency, not whether the products were from the same lot number. In short, Mr. Zajac's point comes nowhere close to establishing "pure fraud," false testimony, fabrication, or anything of the kind.

Lastly, Mr. Zajac accuses the Court of "attack[ing]" him "with threats" during his cross-examination of government expert Waltenbaugh. Def.'s Mot. at 29. The passage

36

he cites, from a sidebar outside the jury's presence, was neither an attack nor a threat. The Court simply explained to the defendant that if he continued to question the witness regarding "military devices," the Court would have to instruct the jury that the relevant statute did not require proof that a "military device" was used. *See* Trial Tr. at 613-14. Advising a party attempting to elicit objectionable testimony of the possible consequences of this—in advance—is something commonly done by trial judges. It's not improper, and it wasn't a threat—rather it provided Mr. Zajac with advance notice of the possible consequences of his inquiry, thus allowing him to decide whether to proceed ahead or change course. The Court did not commit an error in this exchange.

**Conclusion**

For the reasons stated above, the Court denies defendant's "Rule 29 petition for judgment of acquittal" [1289]. Defendant's "motion to vacate trial verdict" remains under advisement.

Date: February 5, 2024

MATTHEW F. KENNELLY
United States District Judge